### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

CAROLYNN PLACE and
LIBERTY DZAMKO, individually,
and on behalf of all others
similarly situated,

Case No. 6:26-cv-757

      Plaintiffs,

v.

THE ORTHOPAEDIC INSTITUTE,
P.A.,a Florida professional association,

      Defendant.

—————————————————/

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Carolynn Place ("Ms. Place") and Liberty Dzamko ("Mrs. Dzamko") (together, "Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), bring this Class Action Complaint against Defendant The Orthopaedic Institute ("TOI" or "Defendant"), and alleges as follows:

### NATURE OF THE ACTION

1.     This is a class action lawsuit arising from TOI's collection and disclosure of Website visitors' sensitive personal health information and electronic communications to Google LLC ("Google") and AdRoll (a NextRoll, Inc. company), without prior notice and consent, through tracking mechanisms embedded in Defendant's website, www.toi-health.com (the "Website").

1

2.      TOI is one of the largest orthopedic healthcare providers in Florida, affiliated with over 16 hospitals across the state, employing approximately 1,500 people, and operating 17 clinic and hospital locations statewide. Through its Website, TOI allows visitors to search for physicians and various medical services, explore orthopedic specialties, schedule appointments, access the patient portal, pay bills, and search for clinic locations.

3.      Unbeknownst to Website visitors, TOI has knowingly implemented three tracking technologies on its Website: the Google Analytics 4 Tracker, the DoubleClick Tracker (both owned by Google), and the AdRoll Tracker (collectively, the "Trackers"). When Website visitors search for doctors or medical specialists, research treatment locations, seek information about specific medical services or conditions, schedule appointments, access the patient portal, pay bills, or interact with other health-related content, TOI procures Google and AdRoll through the Trackers to intercept these electronic communications without consent. This includes the interception of: (a) the names, specialties, and locations of physicians from whom visitors are seeking treatment; (b) the medical facilities where visitors are seeking treatment; (c) the types of medical services or procedures visitors are seeking; (d) search queries entered by visitors into the Website's search bar; (e) attempts to schedule appointments, including the physician and specialty requested; (f) attempts to access the patient portal; and (g) attempts to pay bills online.

4.      This interception of private electronic communications occurs without appropriate notice to visitors and without obtaining their consent, in violation of (1)

2

the Florida Security of Communications Act, Florida Statutes § 934.01, *et seq.* ("FSCA"); (2) the federal Electronic Communications Privacy Act, 18 U.S.C. § 2511 *et seq.* ("ECPA"); and (3) unjust enrichment.

5. Under the FSCA, it is unlawful to intentionally intercept, endeavor to intercept, or procure any other person to intercept any wire, oral, or electronic communication without the consent of all parties to the communication. Under the ECPA, similar protections exist at the federal level, subject to the crime-tort exception which applies where the interception is for the purpose of committing a criminal or tortious act, including the unauthorized disclosure of individually identifiable health information in violation of the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d-6.

6. Through this action, Plaintiffs seek to hold TOI accountable for these privacy violations, to obtain appropriate remedies for affected individuals, and to prevent the continued procurement of interception of electronic communications through Defendant's Website.

## **PARTIES**

7. Plaintiff Carolynn Place is an adult citizen and Florida resident residing within the Middle District of Florida.

8. Plaintiff Liberty Dzamko is an adult citizen and Florida resident residing within the Middle District of Florida.

9. Defendant The Orthopaedic Institute ("TOI") is a private healthcare entity organized and existing under the laws of the State of Florida. TOI is a subsidiary

3

of Orthopedic Care Partners Management, LLC, one of the largest private equity-backed orthopedic platforms in the United States. TOI's principal place of business is in Florida. TOI is affiliated with over 16 hospitals across Florida, including in the Orlando area, employs approximately 1,500 people, reports annual revenue of approximately $76.3 million, and specializes in all aspects of orthopedic care, including joint replacement, orthopedic surgery, and plastic and reconstructive surgery. TOI maintains and operates the Website at www.toi-health.com.

## **JURISDICTION AND VENUE**

10.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges questions of federal law under the ECPA (18 U.S.C. § 2511, et seq.).

11.     This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because Plaintiffs' state-law claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

12.     This Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

13.     This Court has personal jurisdiction over Defendant because TOI is a Florida healthcare entity that operates clinics and hospitals throughout the State of

Florida, including locations within the Middle District of Florida. The acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

14. Venue is proper in the Orlando Division of the Middle District of Florida under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District. TOI operates clinic locations within the Orlando Division and throughout Central Florida. TOI's Website is accessible to and used by patients throughout the Middle District, including within the Orlando Division. The tracking technologies at issue are deployed uniformly across TOI's Website and affect all visitors regardless of location, including the thousands of patients who reside in the Middle District. Plaintiffs reside within the Middle District. TOI's tracking conduct is statewide in nature and emanates from its centralized Website, which serves all 17 of its locations across Florida.

## FACTUAL ALLEGATIONS

### A. Overview of Website Tracking on Healthcare Websites

15. Many websites employ tracking technologies that collect personal data about users' online activities. These tracking technologies have become ubiquitous across the internet, collecting vast amounts of data about user behavior, preferences, and interests. In the healthcare context, these technologies are particularly concerning because they can capture sensitive medical information, including the types of treatments a user is researching, the medical professionals they are seeking, and the health conditions they may be experiencing.

16.     The interception of healthcare-related communications through these tracking technologies is particularly problematic, as it can reveal highly personal and sensitive medical conditions, treatment interests, and care-seeking behaviors to third parties without patients' knowledge or explicit consent.

17.     As detailed in this Complaint, TOI has implemented such tracking technologies on its Website, resulting in the unauthorized interception of visitors' electronic communications by Google and AdRoll.

**B. The Google Analytics Tracking Technology**

18.     Google LLC ("Google") is a multinational technology company headquartered in Mountain View, California. Google operates one of the world's largest online advertising platforms, generating over $200 billion in annual revenue primarily through targeted advertising services. Google's business model depends on collecting vast amounts of user data across its numerous products and services, which it then leverages to deliver targeted advertisements.

19.     The Google Analytics 4 Tracker ("Google Analytics Tracker") is a web analytics service offered by Google that allows website owners to track visitors' actions on their website in order to gain insights into user behavior and to target them with personalized advertisements. TOI has implemented the Google Analytics Tracker on its Website.

20.     The Google Analytics Tracker is a JavaScript-based tracking technology. Website owners implement the Tracker by adding a snippet of JavaScript code to their website's source code. Once implemented, the Tracker loads automatically and

immediately whenever a user visits a page containing the Tracker's source code. The tracking code executes in the background without any visible indication to the user, making it completely invisible to ordinary website visitors. Only users with technical knowledge who deliberately inspect the page's source code or use specialized browser tools might detect the presence of these tracking mechanisms and the interception of their communications by Google. The surreptitious nature of the Tracker means that users typically have no idea that their electronic communications are being intercepted by third parties like Google.

21. The Google Analytics Tracker intercepts and collects various data points about user interactions with a website, which it calls "events," and transmits details of these events to Google. These events include page views, clicks, form submissions, and other custom-defined actions. Along with these events, the Tracker transmits unique identifying cookies, including the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies. These cookies enable Google to create comprehensive user profiles and are third-party marketing cookies, meaning the information does not stay within the site but is sent to Google itself.

22. Google uses the data collected through the Google Analytics Tracker, combined with information from other Google services, to measure the effectiveness of advertising, personalize content and ads that users see on Google's and its partners' sites and applications, and build comprehensive profiles of individuals that can be used for targeting advertisements and other commercial purposes.

### C. The DoubleClick Tracking Technology

23.    DoubleClick is an advertising tracking tool owned by Google and designed to collect information about user behavior on websites in order to improve the targeting and effectiveness of advertising campaigns. DoubleClick's tracking technologies (the "DoubleClick Tracker") automate the ad buying process and use collected data for targeted advertising initiatives. TOI has implemented the DoubleClick Tracker on its Website.

24.    Like the Google Analytics Tracker, Website owners implement the DoubleClick Tracker by adding a snippet of JavaScript code to their website. Once implemented, the DoubleClick Tracker loads automatically and immediately whenever a user visits a page containing the Tracker's source code. The tracking code executes in the background without any visible indication to the user.

25.    Through the DoubleClick Tracker, Google creates and assigns unique identifiers to website visitors, including through the IDE and DSID cookies. The IDE cookie is unique to each user's browser and is used to record user actions and measure ad effectiveness. For users signed into their Google accounts when accessing a website that includes the DoubleClick Tracker, the DSID cookie links their browsing activity directly to their Google profile. These cookies allow Google to track users across websites and serve targeted advertisements.

### D. The AdRoll Tracking Technology

26.    AdRoll, a product of NextRoll, Inc., is a digital marketing platform that provides retargeting and advertising services. AdRoll's tracking technology (the

"AdRoll Tracker") collects data about user behavior on websites and facilitates targeted advertising across the internet. TOI has implemented the AdRoll Tracker on its Website.

27.    The AdRoll Tracker operates similarly to the Google Trackers: once embedded in the Website's source code, it loads automatically in users' browsers and collects data about their interactions with the Website without their knowledge or consent. The AdRoll Tracker assigns unique identifiers to users and, critically, synchronizes these identifiers with other advertising platforms, including Outbrain and Taboola, enabling cross-platform user tracking and data enrichment. As shown in the marked-up images below, when a user visits the Website, the AdRoll Tracker sends a sync request to Taboola containing the AdRoll cookie identifier and the URL the user is visiting on the Website:



28.    Taboola then responds and sets its own cookies, enabling it to associate the user's activity on TOI's Website with Taboola's own user profile:



29.    The AdRoll Tracker also performs the same synchronization with Outbrain. As shown below, the AdRoll Tracker sends the user's AdRoll identifier and the TOI Website URL to Outbrain:



30.    Outbrain then responds and sets its own cookie, enabling it to associate the user's activity on TOI's Website with Outbrain's own user profile:



31. This cross-platform syncing allows these advertising platforms to match AdRoll's identifier with their own, enabling cross-platform user tracking and data enrichment using the sensitive medical information intercepted from TOI's Website.

**E. TOI Shares Users' Private Health Information with Third Parties**

32. Through the Website, users can perform a range of activities, including searching for doctors and other medical providers, scheduling appointments, accessing the patient portal, paying bills, and searching for clinic locations. Users communicate their private and personal information via the site, including protected health information ("PHI"). Unbeknownst to the Website's users, TOI is surreptitiously sharing private and protected information with Google and AdRoll without users' consent.

33. It is important to note that actions such as scheduling an appointment, paying a bill, and accessing the patient portal are typically performed by existing TOI patients. Accordingly, the data transmitted in these interactions is patient data.

34. When a user visits the Website, their browser sends an HTTP request to the Website's server to load the page. In response, the server sends back the webpage, which contains a small piece of code known as a tracker or pixel. The tracker instructs the browser to send the user's IP address, along with other identifying data like cookies, browser details, and device information, to a third-party tracking service. This allows the tracker to monitor user activity and gather insights about the users' behavior on the site.

35. The sections below describe users' interactions with the Website and how they are shared with Google and AdRoll in real time.

### a. Physician Searches

36. The Website allows users to search for physicians by selecting an area of pain and a location, clicking "Search," and then clicking on a physician's profile. For example, as shown in the image below, a user searches for "Hip" physicians in "Ocala" and receives results including physician profiles:



37.     When the user then clicks on a physician's profile, such as Dr. Kenneth J. Koval's profile, the content of the physician's profile page is displayed:



38.     Both the Google Analytics Tracker and DoubleClick Tracker intercept and transmit to Google the fact that the user viewed this specific physician's profile, along with the user's unique identifying cookies. As shown in the marked-up images below, the physician's name and specialty appear in the URL transmitted to Google, alongside the user's 3PSID, 3PAPISID, 3PSIDCC, and NID cookies:







**b. Medical Services Searches**

39.    The Website allows users to browse medical specialties by hovering over the "Services" tab, selecting "specialties" from the drop-down menu, and clicking on any of the 12 listed specialties. For example, as shown below, when a user clicks on "Spine Surgery," the Spine Surgery specialty page is displayed:



40.    The fact that the user viewed the Spine Surgery page is intercepted by the Trackers and transmitted to Google and AdRoll, along with the user's unique identifying cookies. As shown in the marked-up images below:







41.    Similarly, when a user views a specific physician's profile from a specialty page, such as Dr. Stevenson's profile, that interaction is also intercepted and transmitted:



### c.  Appointment Scheduling

42.    When a user clicks the "Request an Appointment" button, including the requested doctor and specialty, these clicks and associated data are intercepted by the Trackers and transmitted to Google and AdRoll, along with unique identifying cookies. As shown in the marked-up images below:







### d. Patient Portal Access

43. When a user clicks on the "Patient Portal" tab from the Website's homepage, this click is intercepted by the Trackers and shared with Google and AdRoll, along with unique identifying cookies. The attempt to access the patient portal reveals the user's status as a TOI patient. As shown below:





### e. Bill Payment

44.    When a user clicks "Pay Your Bill" from the Website's "Resources" drop-down menu, this action is intercepted by the Trackers and transmitted to Google and AdRoll, along with unique identifying cookies. Like patient portal access, attempting to pay a bill identifies the user as an existing TOI patient. As shown below:





### f. Location Searches

45.    The Website allows users to search for clinic and hospital locations operated by TOI. These user searches are also shared in real time with third parties, without the users' knowledge. For example, as shown below, when a user searches for a TOI facility in Alachua, the user's search and visit to the specific clinic page were transmitted in real time to Google and AdRoll, together with unique third-party identifying cookies:









## F. Defendant's Responsibility for the Interception of Electronic Communications

46.     Although the Trackers perform the technical functions of intercepting electronic communications, TOI bears full legal responsibility for these actions under the FSCA and ECPA as the entity that has procured Google and AdRoll to intercept these communications.

47.     TOI made the affirmative decision to implement the Google Analytics Tracker, DoubleClick Tracker, and AdRoll Tracker on its Website. This implementation was a deliberate action requiring Defendant's web administrators to copy the Trackers' tracking code and insert it into the Website's source code. Without TOI's deliberate implementation of this code, Google and AdRoll would have no access to the electronic communications of Defendant's Website visitors.

48.     Defendant controls which pages of its Website contain the tracking code and could choose to exclude tracking from sensitive pages where healthcare

23

information is accessed or inputted, yet has chosen to implement tracking across various sensitive areas of its Website.

### G. TOI's Privacy Policy Does Not Authorize the Tracking Conduct

49.    TOI's Website includes a privacy policy link at the bottom of the page:



50.    To the extent TOI relies on any privacy policy or terms of use to assert that users consented to the tracking conduct described herein, any such policy is unenforceable. TOI's privacy policy is presented as a browsewrap agreement—a hyperlink at the bottom of the browser—and users are not required to affirmatively agree to the policy in order to use the Website. Browsewrap agreements are only enforced when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice. TOI's privacy policy fails this test. There is nothing in the text of any cookie banner that would place a user on notice that

the use of the Website alone would constitute implied acceptance of the terms of the hyperlinked privacy policy.

51.     Even if enforceable, TOI's privacy policy does not operate as consent to TOI's use of the Trackers to intercept users' private health information and transmit it to third parties for advertising purposes. Consent is generally limited to the specific conduct authorized, and a reasonable person would not understand a generic privacy policy to authorize the interception and transmission of sensitive medical information to advertising companies.

## H. TOI's Conduct Violates HIPAA

52.     TOI is a healthcare provider and, as such, qualifies as a "covered entity" under HIPAA as defined in 45 C.F.R. § 160.103.

53.     Protected health information ("PHI") is defined as "individually identifiable health information" that is (i) transmitted by electronic media; (ii) maintained in electronic media; or (iii) transmitted or maintained in any other form or medium. 45 C.F.R. § 160.103. Individually identifiable health information ("IIHI") is defined in 45 C.F.R. § 160.103 as any health information that is: (1) created or received by a healthcare provider; (2) relates to an individual's past, present, or future physical or mental health or condition; and (3) either identifies the individual or provides a reasonable basis to believe the individual can be identified.

54.     When users visit the Website, they search for services, select care centers and providers, request appointments, and enter the patient portal. This information, when combined with identifiers such as Google Analytics, DoubleClick, and AdRoll

tracking cookies, qualifies as PHI because it is (1) individually identifiable and (2) relates to the patient's health status. The cookies and device identifiers transmitted alongside users' health-related interactions constitute "unique identifying number[s], characteristic[s], or code[s]" under 45 C.F.R. § 164.514(b)(2)(i), qualifying as indirect identifiers. When those identifiers travel in the same payload as the medical service needs or care center selections, the combined dataset becomes individually identifiable health information, and therefore PHI.

55.    Under HIPAA, it is unlawful for a covered entity to knowingly disclose individually identifiable health information without authorization with intent to sell, transfer, or use such information for commercial advantage, personal gain, or malicious harm. 42 U.S.C. § 1320d-6. TOI's deployment of the Trackers on its Website, which results in the automatic transmission of users' PHI to Google and AdRoll for advertising and commercial purposes, constitutes an unauthorized disclosure of PHI in violation of HIPAA.

56.    Upon information and belief, TOI has not executed HIPAA-compliant Business Associate Agreements ("BAAs") with Google or AdRoll for the tracking activities described herein, and has not obtained the HIPAA-compliant patient authorizations necessary to permit such disclosures for non-treatment purposes.

### I. Plaintiffs' Specific Experiences

57.    Plaintiff Carolynn Place is a TOI patient who was a patient of a TOI hospital located in the Middle District of Florida. Ms. Place has used TOI's Website extensively within the past two years. Ms. Place has described visiting the Website

many times due to ongoing issues and surveys repeatedly sent by TOI. During her use of the Website, Ms. Place used the Google Chrome browser on her Android mobile device. Ms. Place did not use ad blockers or incognito mode, meaning the Trackers embedded on TOI's Website were fully operational during each of her visits.

58.     As a registered TOI patient, Ms. Place used the Website to search for and view physician profiles, schedule appointments, access the patient portal, pay bills, and search for clinic locations. Each of these interactions communicated sensitive medical information about Ms. Place, including the type of medical care she was seeking, the physicians from whom she sought treatment, and her status as a TOI patient.

59.     Plaintiff Liberty Dzamko is a TOI patient who underwent surgery at a TOI facility in February 2024. Mrs. Dzamko resides in the The Villages area of Florida, within the Middle District of Florida. Mrs. Dzamko has used TOI's Website within the past two years. During her use of the Website, Mrs. Dzamko used the Google Chrome browser on her Android mobile device. Mrs. Dzamko did not use ad blockers or incognito mode, meaning the Trackers embedded on TOI's Website were fully operational during each of her visits.

60.     As a registered TOI patient, Plaintiff Dzamko used the Website to search for and view physician profiles, search for medical services and specialties, attempt to access the patient portal, and search for clinic and hospital locations. Each of these interactions communicated sensitive medical information about Mrs. Dzamko,

27

including the type of medical care she was seeking, the physicians from whom she sought treatment, and her status as a TOI patient.

61. Because TOI utilized the Trackers on its Website, Google and AdRoll intercepted and received Plaintiffs' sensitive medical information and electronic communications without their knowledge or consent. At no time did Plaintiffs consent to the interception of their sensitive medical information and electronic communications with Defendant through the Website by Google or AdRoll, or to Defendant enabling Google or AdRoll to access or intercept such information. Plaintiffs reasonably expected that their online communications with Defendant were solely between themselves and Defendant and that such communications would not be transmitted to or disclosed to third parties.

**INJURY TO PLAINTIFF AND CLASS MEMBERS**

62. TOI's procurement of unauthorized interception of Website user communications has caused actual harm to Plaintiffs and Class Members in multiple ways.

63. Invasion of Privacy: Medical and health-related information about individuals is highly private, and its interception can result in significant embarrassment, stigma, and even discrimination. Plaintiffs and Class Members have suffered an invasion of their privacy through the unauthorized interception of their electronic communications and healthcare-related activities. The interception of these communications violated Plaintiffs' and Class Members' reasonable expectation that their interactions with a healthcare provider would remain private.

28

64. Loss of Data Value: Plaintiffs and Class Members have been deprived of the economic value of their personal data. In today's digital economy, personal data—especially health-related information—has significant commercial value.

65. Diminished Confidence in Healthcare Privacy: The unauthorized interception of Plaintiffs' and Class Members' communications has undermined their ability to freely and confidentially seek medical information, explore treatments, or manage their healthcare without fear that their activities are being intercepted by third parties.

66. Risk of Further Use of Intercepted Data: Once intercepted by Google and AdRoll, Plaintiffs' and Class Members' data is beyond their control. This creates an ongoing risk that their sensitive health-related information may be further processed, combined with other data sources, or potentially used by additional third parties, causing continued and future harm.

67. Statutory Injury: Independent of the above harms, TOI's violation of the FSCA and ECPA has caused Plaintiffs and Class Members to suffer statutory injury, entitling them to the remedies provided by law, including statutory damages.

## CLASS ACTION ALLEGATIONS

68. Plaintiffs bring this action on behalf of herself individually and on behalf of all other persons similarly situated pursuant to Rules 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

69. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

All individuals residing in the United States whose electronic communications were intercepted through The Orthopaedic Institute's Website by Google and/or AdRoll within the applicable statute of limitations period (the "Nationwide Class").

70.    Plaintiffs also seek to represent the following state subclass:

All individuals residing in Florida whose electronic communications were intercepted through The Orthopaedic Institute's Website by Google and/or AdRoll within the applicable statute of limitations period (the "Florida Class").

71.    The Nationwide Class and Florida Class are collectively referred to as the "Class."

72.    Excluded from the Class are: (a) Defendant, its officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (b) Google and AdRoll, their officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (c) any governmental entities; (d) the judge(s) to whom this case is assigned, their immediate family members, and staff; and (e) any jurors assigned to this case.

73.    Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

### A. Numerosity

74.    The Class is so numerous that joinder of all members is impracticable. TOI is one of the largest orthopedic healthcare providers in Florida, affiliated with over 16 hospitals and operating 17 clinic and hospital locations statewide, with approximately 1,500 employees. Upon information and belief, the Website receives tens of thousands of unique visitors each year, many of whom had their electronic

communications intercepted by Google and/or AdRoll during the relevant time period.

75.    The Class is ascertainable because its members can be identified through objective criteria using records maintained by Defendant and third parties. TOI's web server logs, Google Analytics account data, and AdRoll account data contain records of Website visitors whose electronic communications were intercepted by the Trackers during the applicable statute of limitations period. These records include IP addresses, cookie identifiers, timestamps, and the specific pages visited. The identities of Class Members can be determined without resort to individualized fact-finding or mini-trials, and the class definition is sufficiently definite so that it is administratively feasible to determine whether a particular individual is a member of the Class.

### B. Commonality and Predominance

76.    There are questions of law and fact common to the Class that predominate over any questions affecting only individual members. These common questions include: (a) Whether TOI implemented the Trackers on its Website; (b) Whether the Trackers intercepted Website users' electronic communications; (c) Whether TOI procured, enabled, and aided and abetted the interception of Website users' electronic communications; (d) Whether TOI obtained Website users' consent to procure the interception of their electronic communications; (e) Whether TOI's conduct violated Chapter 934.03 of the FSCA; (f) Whether TOI's conduct violated 18 U.S.C. § 2511 of the ECPA; (g) Whether TOI has been unjustly enriched through its

conduct; (h) Whether Plaintiffs and Class Members are entitled to damages and other monetary relief, and if so, in what amount; and (i) Whether Plaintiffs and Class Members are entitled to equitable relief, including but not limited to injunctive relief.

77.     These common questions predominate over any individualized issues because Plaintiffs' claims challenge TOI's uniform, centralized conduct — the deployment of identical tracking code across its entire Website — rather than any individualized interaction between TOI and a particular Class Member. The Trackers operated in the same manner on every page of the Website, intercepting the same categories of data and transmitting that data to the same third parties using the same cookies and identifiers, regardless of which user visited the site. Liability can therefore be established on a class-wide basis through common proof, including TOI's Website source code, its contracts or arrangements with Google and AdRoll, and the technical operation of the Trackers.

78.     Any individualized questions — such as the specific pages a given Class Member visited or the precise dates of their visits — do not predominate because they are relevant only to damages, not to the threshold questions of liability and consent that are common to the entire Class. Courts routinely hold that predominance is satisfied in healthcare website tracking cases because the core liability inquiry focuses on the defendant's uniform deployment of tracking technology without consent, not on the content of any individual user's browsing session.

## C. Typicality

79.    Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and Class Members all visited TOI's Website and had their electronic communications intercepted by Google and/or AdRoll without their consent. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other Class Members and are based on the same legal theories.

## D. Adequacy

80.    Plaintiff will fairly and adequately protect the interests of the Class. Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no interests adverse or antagonistic to those of the Class.

81.    Plaintiffs have retained counsel who are experienced in complex class action litigation, including class actions involving privacy violations, unlawful data collection, and the interception of electronic communications in the healthcare context. Plaintiffs' counsel have the resources, expertise, and commitment to prosecute this action vigorously on behalf of the entire Class through discovery, class certification, trial, and any appeals. Plaintiffs' counsel are familiar with the specific legal and technical issues presented by claims arising from the deployment of third-party tracking technologies on websites and have dedicated substantial resources to investigating the claims asserted in this Complaint.

## E. Superiority

82.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by many Class

33

Members may be relatively small compared to the burden and expense of individual litigation, making it difficult for Class Members to individually redress the wrongs done to them. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications. A class action provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

83.     Injunctive Relief Appropriate: TOI has acted or refused to act on grounds generally applicable to the Class as a whole, making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I: VIOLATION OF THE FLORIDA SECURITY OF COMMUNICATIONS ACT (Fla. Stat. § 934.03)
### (On Behalf of Plaintiffs and the Florida Class)

84.     Plaintiffs incorporate the paragraphs 1–83, above, as if fully set forth herein and bring this Count individually and on behalf of the proposed Florida Class.

85.     The FSCA prohibits intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any electronic communication. Fla. Stat. § 934.03(1)(a). Unlike the federal Wiretap Act, the FSCA is an all-party consent statute, requiring the consent of all parties to the communication. Fla. Stat. § 934.03(2)(d).

34

86.    The FSCA defines "intercept" as "the aural or other acquisition of the contents of any electronic communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3). It further defines "contents" as "any information concerning the substance, purport, or meaning of that communication." Fla. Stat. § 934.02(7). The FSCA was specifically "designed to protect precisely the information at issue in this case—private medical information." *W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *4 (M.D. Fla. Mar. 6, 2025).

87.    The Trackers deployed on TOI's Website constitute "electronic, mechanical, or other device[s]" within the meaning of the FSCA. Unlike session replay technology that merely tracks mouse movements, the Trackers at issue here actively intercept and transmit the *contents* of users' communications, including URLs that convey in plain text users' search queries, the doctors and facilities they are investigating, and other medical information.

88.    The transmissions between Plaintiffs and Class Members and TOI's Website constitute "electronic communications" within the meaning of the FSCA because they are transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system. Fla. Stat. § 934.02(12).

89.    TOI intentionally procured Google and AdRoll to intercept these electronic communications by deliberately implementing the Trackers on its Website. Plaintiffs and Class Members did not consent to this interception.

35

90.    As a direct result of TOI's violations, Plaintiffs and Class Members are entitled to: (a) actual damages or statutory damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher; (b) punitive damages; and (c) reasonable attorney's fees and costs of litigation under Fla. Stat. § 934.10.

91.    Plaintiffs and Class Members are also entitled to injunctive relief to prevent TOI from continuing to implement Trackers that intercept their electronic communications without proper consent.

### COUNT II: VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT (18 U.S.C. § 2511 et seq.) (On Behalf of Plaintiffs and the Nationwide Class)

92.    Plaintiffs incorporate paragraphs 1–83, above, as if fully set forth herein and brings this Count individually and on behalf of the proposed Nationwide Class.

93.    The ECPA prohibits the intentional interception of electronic communications, and the procuring of any other person to intercept electronic communications. 18 U.S.C. § 2511(1)(a).

94.    The ECPA provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of 18 U.S.C. § 2511(1)(a). 18 U.S.C. § 2520(a).

95.    The transmissions between Plaintiffs and Class Members and TOI's Website are "transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and

therefore constitute "electronic communications" within the meaning of the ECPA. 18 U.S.C. § 2510(12).

96.    The Trackers intercepted the "contents" of Plaintiffs' and Class Members' electronic communications within the meaning of the ECPA, for the same reasons set forth above with respect to the FSCA.

97.    Although the ECPA contains a one-party consent exception, 18 U.S.C. § 2511(2)(d), that exception does not apply here because the communications were intercepted for the purpose of committing criminal and tortious acts in violation of the Constitution or laws of the United States and the State of Florida. Specifically, the crime-tort exception to the one-party consent rule applies because TOI's interception was for the purpose of disclosing users' individually identifiable health information to third parties in violation of HIPAA, 42 U.S.C. § 1320d-6. A disclosure that violates HIPAA is a violation of law that is independent of a violation of the ECPA, and that is enough to conclude that the crime-tort exception applies. *See Stein v. Edward-Elmhurst Health*, 2025 WL 580556, at *4 (N.D. Ill. Feb. 21, 2025); *W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *6–7 (M.D. Fla. Mar. 6, 2025).

98.    That TOI may have been motivated by commercial purposes does not preclude application of the crime-tort exception. *See Stein*, 2025 WL 580556, at *6 ("The language of the statute gives no hint that conduct falls outside the reach of the statute if a person acted based on financial motivations.").

99.    Users did not consent to TOI's procurement of third-party interception and sharing of their health information for advertising and analytics purposes.

100. TOI was not acting under the color of law when procuring these interceptions, and no other exception to ECPA liability applies.

101. As a direct result of TOI's violations, Plaintiffs and Class Members are entitled to: (a) actual damages or statutory damages of $100 per day per violation or $10,000, whichever is greater; (b) punitive damages; and (c) reasonable attorneys' fees and costs under 18 U.S.C. § 2520.

## COUNT III: UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Nationwide Class)

102. Plaintiffs incorporate paragraphs 1–83, above, as if fully set forth herein and brings this Count individually and on behalf of the proposed Nationwide Class.

103. TOI has received a benefit from Plaintiffs and Class Members through the interception of their valuable personal data via the Trackers.

104. By implementing the Trackers on its Website, TOI has been able to procure the interception of users' electronic communications by Google and AdRoll for business purposes, including marketing and advertising analytics, thereby enriching itself at the expense of Plaintiffs and Class Members.

105. Private information, at least in the context of sensitive medical information, has value. *See W.W.*, 2025 WL 722892, at *10.

106. TOI has retained this benefit under circumstances which make it inequitable to do so without payment of its value to Plaintiffs and Class Members.

107. It would be unjust and inequitable to allow TOI to retain the benefits of its unlawful conduct.

108.    Plaintiffs and Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by TOI through its wrongful conduct.

## **PRAYER FOR RELIEF**

109.    WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of all other Class Members similarly situated, respectfully requests that this Court:

(a) Certify this case as a class action on behalf of the proposed Class, appoint Plaintiffs as class representatives, and appoint Plaintiffs' counsel as class counsel;

(b) Declare that TOI's actions, as described herein, violate the Florida Security of Communications Act and the Electronic Communications Privacy Act, and constitute unjust enrichment;

(c) Award Plaintiff and the Class compensatory damages in an amount to be determined at trial;

(d) Award Plaintiff and the Class statutory damages as provided by the FSCA and ECPA;

(e) Award Plaintiff and the Class punitive damages;

(f) Award Plaintiff and the Class restitution and disgorgement of all profits, benefits, and other compensation obtained by TOI from its wrongful conduct;

(g) Award injunctive relief requiring TOI to cease procuring the interception of Website users' communications without proper consent; destroy all

user data intercepted through the Trackers; and implement appropriate safeguards to ensure the protection of Website users' privacy in the future;

(h) Award Plaintiff and the Class pre-judgment and post-judgment interest;

(i) Award Plaintiff and the Class reasonable attorneys' fees and costs, as allowed by law; and

(j) Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: April 7, 2026

Respectfully submitted,

By: */s/ Adam A. Schwartzbaum*

Adam A. Schwartzbaum,
Esq. Florida Bar No. 93014
**SCHWARTZBAUM**
14 NE 1st Ave Ste 705
Miami, FL 33132
Telephone: 786-453-8485
Primary Email:
adam@schwartzbaum.com
Secondary Email:
admin@schwartzbaum.com

Don Bivens*
Maxwell K. Weiss*
15169 N. Scottsdale Road, Suite 205

Scottsdale, Arizona 85254
Telephone: 602- 762-2661
Email: Don@DonBivens.com
         Max@DonBivens.com

*Pro Hac Vice Forthecoming

*Counsel for Plaintiff and the Proposed Class*

41